**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| **v.** | : |
| | **CRIMINAL NO. 24-116** |
| **FRANCIS JAVIER MATOS VARGAS** | : |
| **WASSEIM BASSET** | |
| **a/k/a "Wes"** | : |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Wasseim Basset repeatedly misrepresented his identity to citizens in the

Eastern District of Pennsylvania and convinced them to send him their life savings in order to

recover funds from a fictitious settlement in another matter. As a result of this scheme, one

victim lost funds for his retirement and his children's college education, was forced to sell his

home, and is nearing financial ruin. On May 22, 2025, the defendant pled guilty pursuant to a

ten-count indictment charging mail and wire fraud conspiracy, in violation of 18 U.S.C. § 1349

(Count One), and wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two through Ten), in

relation to the defendant's involvement in the fraud scheme. A sentencing hearing has been

scheduled for April 28, 2026, at 11:00 a.m., before the Honorable Paul S. Diamond. The

sentencing guidelines recommend a sentence between 63 to 78 months' imprisonment. For these

reasons, as well as for the reasons provided below, the government recommends a sentence of

incarceration within the advisory guideline range of 63 to 78 months, absent any basis for a

below-guideline sentence addressed in the supplemental sealed attachment to this sentencing

memorandum.

I.      **FACTUAL BACKGROUND**

Defendant Basset, co-defendant Vargas, and their co-conspirators impersonated agents

from the Securities and Exchange Commission (the "SEC") while contacting victims of a prior

fraud which the SEC was investigating. Basset and his coconspirators convinced the victims that

there had been a settlement in the prior fraud investigation, and deceived the victims into paying

them "advance fees" in order to recover from the SEC enforcement action. Two of the victims,

F.K and N.S., resided in the Eastern District of Pennsylvania at the time they were defrauded by

Basset and his coconspirators. Basset and Vargas provided F.K. and N.S. mailing addresses,

bank accounts, and bitcoin wallets to complete fraudulent financial transactions in order to

recover from the fictitious SEC settlement. Despite their representations to the victims, the

defendants were not SEC agents, and they falsely held themselves out as agents of the SEC

through written communications; furthermore, the "advance fees" and "settlement fees" that the

defendants claimed were necessary for the SEC to process their claims, and the purported

settlement and enforcement actions themselves, were entirely fictitious. Rather, the "fees" paid

by the victims went to Basset and his co-conspirators for their own personal use.

Between January 13, 2020, and August 5, 2020, victim F.K. received approximately 71

emails, as well as phone calls, text messages, and voice messages from 13 TextNow phone

numbers, enticing him to remit unnecessary and fraudulent payments to participate in a fictitious

SEC settlement. One of the TextNow users identified himself to F.K. as Mark Melo. Defendant

Wasseim Basset controlled and operated the TextNow phone numbers used by the person

purporting to be Mark Melo in communications with F.K.

TextNow records also show that between March 3, 2021, and April 7, 2021, there were

multiple phone calls and text messages between victim N.S. and/or E.S. and defendant Basset

regarding payment of fees to receive an SEC settlement award. At the time of the scheme.

victims N.S. and E.S. were husband and wife, and senior citizens.

There were also multiple calls and text messages between Basset and Vargas during the same period that victims F.K. and N.S./E.S. were receiving requests for fees from Basset and Vargas. For example, on March 12, 2021, Basset texted Vargas at the TextNow phone number 213-559-8584. On the same day, both before and after this text exchange, Vargas used the -8584 number to communicate with N.S. On March 24, 2021, again using the -8584 TextNow phone number, Vargas made three phone calls to N.S. Immediately after talking to N.S., Vargas placed three phone calls to Basset.

Through this activity, Basset and his co-conspirators committed wire fraud. In furtherance of their scheme, Basset and his co-conspirators caused the following interstate wires to be transmitted:

- On January 13, 2020, F.K. wired $3,820.07 from F.K.'s bank account in Pennsylvania to a bank account in New York as requested in phone and email communications with a co-conspirator (Count 2).

- On March 8, 2021, N.S. wired $8,458.84 from N.S.'s bank account in Pennsylvania to a bank account in Florida as requested in phone and email communications with defendants Vargas and Basset (Count 3).

- On March 10, 2021, N.S. wired $14,370.15 from N.S.'s bank account in Pennsylvania to a bank account in Florida as requested in phone and email communications with defendants Vargas and Basset (Count 4).

- On March 17, 2021, N.S. wired $5,972.20 from N.S.'s bank account in Pennsylvania to a bank account in Florida as requested in phone and email communications with defendants Vargas and Basset (Count 5).

- On July 16, 2021, F.K. wired $162,270 from F.K.'s bank account in Pennsylvania

to a bank account in Florida as requested in phone and email communications with defendant Basset (Count 6).

- On July 19, 2021, F.K. wired $162,270 from F.K.'s bank account in Pennsylvania to a bank account in Florida as requested in phone and email communications with defendant Basset (Count 7).

- On August 20, 2021, F.K. wired $180,300 from F.K.'s bank account in Pennsylvania to a bank account in Florida as requested in phone and email communications with a coconspirator (Count 8).

- On September 7, 2021, F.K. wired $180,300 from F.K.'s bank account in Pennsylvania to a bank account in Florida as requested in phone and email communications with a coconspirator (Count 9).

- On October 13, 2021, F.K. wired $133,422 from F.K.'s bank account in Pennsylvania to a bank account in Florida as requested in phone and email communications with a coconspirator (Count 10).

Combined, F.K and N.S. paid approximately $1,502,816 via cashier checks, EFT, and cryptocurrency transfers to Basset and his co-conspirators in response to their demands for "advance fee" payments that the victims were led to believe were necessary to obtain money from fictitious SEC enforcement actions.

## II.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentence

The maximum sentence for conspiracy in violation of 18 U.S.C. § 1349 (Count One) is the same as the maximum sentence for wire fraud in violation of 18 U.S.C. § 1343 (Counts Two through Ten). Thus, for Counts One through Ten, the Court may impose the following statutory

maximum sentence for each count: 20 years' imprisonment, three years' supervised release, a $250,000 fine, and a $100 special assessment. PSR ¶¶ 105, 108, 113-14. The total maximum sentence for all Counts One through Ten is 200 years' imprisonment, three years' supervised release, a $2,500,000 fine, and $1,000 special assessment. *Id.*

Full restitution of as much as $1,502,816 also shall be ordered. *Id.* ¶ 118. Forfeiture of all property that constitutes or is derived from proceeds traceable to the commission of the offenses also may be ordered.

In addition, supervised release may be revoked if its terms and conditions are violated. When supervised release is revoked, the original term of imprisonment may be increased by up to two years on each of Counts One through Ten. Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

Defendant Basset, who is not a citizen of the United States, also will be subject to immigration proceedings, which will likely result in him being removed from the United States, denied citizenship, and denied admission to the United States in the future.

B.    **Sentencing Guidelines Calculation**

The presentence report correctly calculates defendant Basset's guideline range for Counts One through Ten as 63 to 78 months in prison. PSR ¶ 106.

Counts 2 through 10 (wire fraud) are grouped for guideline calculation purposes because the offense level is determined largely on the basis of the total amount of harm or loss, pursuant to USSG §3D1.2(d). Count 1 (conspiracy) is further grouped with Counts 2 through 10 since

Count 1 charges a conspiracy and Counts 2 through 10 represent substantive acts of the conspiracy, pursuant to USSG §3D1.2(b). *Id.* ¶ 36.

The base offense level for the grouped counts is seven because the offenses have a statutory term of imprisonment of 20 years or more, pursuant USSG §2B1.1(a)(1). *Id.* ¶ 37.

The offense level is increased by 16 points because the total loss of $1,502,816 is more than $1.5 million but less than $3.5 million, pursuant to USSG §2B1.1(b)(I). *Id.* ¶ 38.

The offense level is increased by another two points because the offenses resulted in substantial financial hardship to one or more victims, pursuant to USSG §2B1.1(b)(2)(A)(iii). *Id.* ¶¶ 30-31, 39.

The offense level is increased by another two points, pursuant to USSG §2B1.1(b)(9)(A), since the offenses involved a misrepresentation that the defendant was acting on behalf of a government agency, the SEC. *Id.* ¶ 40.

The offense level is increased by another two points, pursuant to USSG §2B1.1(b)(10)(B) and (b)(10)(C), since a substantial part of a fraudulent scheme was committed from outside of the United States – that is, in the Dominican Republic – and the defendant intentionally engaged in or caused conduct constituting sophisticated means. *Id.* ¶ 41.

Pursuant to USSG §3E1.1(a), a two-level decrease should be applied since the defendant demonstrated acceptance of responsibility, and another one-level reduction should be applied pursuant to §3E1.1(b) because of timely acceptance of responsibility. *Id.* ¶¶ 47-48.

This results in a total offense level of 26. *Id.* ¶ 49.

The presentence report correctly calculates the defendant's criminal history score of zero, which yields a criminal history category of I. *Id.* ¶¶ 63-64.

The guideline range based on a total offense level of 26 for Counts One through Ten and a criminal history category of I is 63 to 78 months in prison. *Id.* ¶ 106.

## III.    ANALYSIS

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[1]

At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted); *see also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

---

[1]  Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

A.    **Sentencing Factors**

The Court must consider all of the sentencing considerations set forth in § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

B.    **Application**

The relevant § 3553(a) factors will be discussed in turn.

1.    **The Nature and Circumstances of the Offense**

The fraudulent scheme in this case was designed to prey on individuals who had already been victimized in a prior fraud scheme and may have been entitled to recover from a settlement related to a government investigation for that fraud scheme. Basset and his co-conspirators targeted individuals who had been duped before, believing they could be duped again, taking advantage of the victims' desire for redress from their prior injury. And the defendant succeeded. His conduct resulted in significant and irreversible financial loss to his victims. As a result of the defendant's fraudulent scheme, victim F.K. lost his life savings, including funds set aside for his retirement and his children's college tuition. Further, the stress of the financial loss caused F.K.

and his wife to lose their primary jobs, and they now struggle to meet basic living expenses. F.K. is currently working only part-time and F.K.'s spouse is unemployed and having difficulty finding employment due to the spouse's age of 62. Additionally, F.K.'s credit was destroyed, rendering him unable to obtain basic banking accounts. *See* PSR ¶¶ 30-31.

### 2. The History and Characteristics of the Defendant

The defendant, age 45, has a zero-point criminal history score because his multiple criminal convictions are too remote to be counted in his criminal history. His convictions range from 1999 to 2006, age 18 to 25, and include theft over $5,000, failure to comply with recognizance, assault (spousal), possession of break in instruments, dangerous operation of a motor vehicle, resisting arrest, and failure to attend court. *Id.* ¶¶ 57-62. All arrests and convictions occurred in Windsor, Ontario, in Canada. *Id.* The defendant also had seven juvenile convictions from 1996 to 2000, age 15 to 19, all in Windsor, Oshawa, and Newmarket, Ontario, for offenses of mischief, possession of property obtained by crime over $5,000, dangerous operation of a motor vehicle, failure to comply with recognizance, escape from lawful custody, theft over $5,000, and taking a motor vehicle. *Id.* ¶¶ 50-56.

The defendant was born in Baghdad, Iraq during the Iran-Iraq War, which began in 1980. *Id.* ¶¶ 69, 71. His parents married sometime after his birth. *Id.* ¶¶ 69, 72. Both parents are now 70 years old and retired and live separately in Windsor, Canada. *Id.* ¶ 69. The defendant shares a close relationship with both parents and communicates with them regularly. *Id.*

The defendant has a younger sister, age 35, who also lives in Windsor and works as a police officer. *Id.* ¶ 70. The defendant regularly communicates with his sister by telephone. *Id.*

The defendant's father served in the Iraqi Army during the Iran-Iraq War, causing separation from his family. *Id.* ¶ 71. His father "escaped the war," and after some years reunited

with his family in Toronto, Canada where he worked as a high-pressure pipe welder and steam fitter. *Id.* The defendant's parents separated when he was in the eighth grade. *Id.* ¶ 72. Thereafter, the defendant and his sister lived with his mother while their father visited weekly. *Id.* The defendant reported that his emotional and material needs were met as a child and that he was "very loved." *Id.* ¶¶ 73-74.

In 2003 the defendant married, but in approximately 2014 he separated from his wife and now intends to divorce. *Id.* ¶¶ 75-76. The marriage produced three children, a daughter age 21 and two sons ages 19 and 20. *Id.* ¶ 75. His daughter is completing high school but suffers from mental health issues. *Id.* ¶ 78. One son is completing high school, and the other is working. *Id.* ¶ 78. All three children live in Canada, and the defendant maintains regular phone contact with all three children. *Id.* ¶ 78.

### 3. The Need for Sentence Imposed to Reflect Seriousness of the Offense, Promote Respect for Law, and Provide Just Punishment

There is a strong need to impose a sentence that reflects the seriousness of the defendant's offenses, promotes respect for U.S. laws, and provides just punishment. Our country is plagued by fraud crimes utilizing technology and cell phone applications or software and preying on vulnerable victims, and the defendant's conduct demonstrates lack of respect for the law. It is imperative, therefore, that the defendant's conduct be punished accordingly.

### 4. The Need for Adequate Deterrence and Protection of Public

The need for adequate deterrence of this type of crime is significant. The defendant has multiple prior convictions which resulted in little to no imprisonment and has so far not been deterred from criminal activity. Furthermore, the recommended sentence protects the public from further crimes by the defendant, for at least as long as he remains in prison.

**5. The Need to Provide the Defendant with Training, Medical Care or Correctional Treatment**

There is no demonstrated need to adjust the sentence in order to provide the defendant with needed educational or vocational training, medical care, or additional treatment that cannot be adequately addressed by the Bureau of Prisons during incarceration.

**6. The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants**

Normally, the government recommends a within-guideline sentence based in part on the fact that such a sentence serves the vital goal of uniformity and fairness. Reference to the sentencing guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the best available means to meet this goal of uniformity and fairness. Here, the parties' plea agreement does not state an agreed-upon sentence.

**7. Restitution**

The defendant has agreed to pay restitution in any amount determined by the Court. *See* Plea Agreement ¶ 7.

**C. Supervised Release**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The Court is further directed to state in open court its reasons for imposing or not imposing a term of supervised release, and its reasons for the length of a term imposed. Further, Section 5D1.3 sets forth mandatory conditions of a term of supervised release, and "discretionary conditions" that the Court may impose, following the same individualized assessment.

The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of at least three years is warranted. As explained above, the defendant presents a lengthy record of criminal conduct for which he has not received a significant term of imprisonment. Close supervision following release from imprisonment is warranted to aid his reentry to society and to protect the public. A term of supervised release in this case advances the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), assure that the defendant continues to pursue education and vocational efforts that promote rehabilitation, § 3553(a)(2)(D), and pays restitution to victims, § 3553(a)(7). Further, the Sentencing Commission recognizes that "the more serious the defendant's criminal history, the greater the need for supervised release." § 5D1.1 app. note 2.

This assessment also supports imposition of all of the mandatory and standard conditions of supervised release listed in Section 5D1.3.

## IV.    CONCLUSION

For these reasons and subject to any that may be presented at the defendant's sentencing hearing and in the Sealed Supplement, the government believes that a significant sentence that

fully accounts for the scope and severity of the defendant's criminal conduct, or guideline sentence, is appropriate in this case.

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s Angella N. Middleton*
ANGELLA N. MIDDLETON
Assistant United States Attorney

Date:  April 22, 2026

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been served by electronic mail upon the following:

Eugene P. Tinari, Esquire
Tinari Law Firm, LLC
1313 Race Street
Philadelphia, PA 19107
(215) 569-2551
eugene@etinarilaw.com
*Counsel for Defendant Wasseim Basset*


<u>*/s Angella N. Middleton*</u>
ANGELLA N. MIDDLETON
Assistant United States Attorney


Date: April 22, 2026